Mimi ROGERS, an individual,
Plaintiff,

v.

HOME SHOPPING NETWORK, INC.,
dba Home Shopping Network, and dba
the Home Shopping Network; et al.,
Defendants.

No. CV 98–6326DDP (BQRX).

United States District Court,
C.D. California.

Oct. 15, 1999.

Laurie K. Jones, Bronson Bronson & McKinnon, Barry B. Langberg, Michael J. Niborski, Richard S. Forman, Stroock Stroock & Lavan, Los Angeles, CA, for Plaintiff.

W. Douglas Kari, Robert Max Mahlowitz, Orrick Herrington & Sutcliffe, Bruce A. Wessel, Irell & Manella, Los Angeles, CA, Gerson A. Zweifach, Paul Gaffney, Craig Singer, Williams & Connolly, Washington, DC, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION TO COMPEL DISCLOSURE OF CONFIDENTIAL SOURCES
[Motion filed on 9/7/99]

PREGERSON, District Judge.

The plaintiff's motion to compel disclosure of confidential sources came before this Court for oral argument on October 4, 1999. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court denies the plaintiff's motion.

### Background

The plaintiff, Mimi Rogers, brings this action for libel against the defendants, Home Shopping Network, Inc. ("HSN") and National Enquirer, Inc. ("Enquirer"), as a result of an article published in the June 2, 1998 issue of the "Enquirer." The article is entitled, "Mimi Rogers Goes Berserk & trashes TV studio room," and purports to detail Rogers' reaction to HSN's cancellation of the remaining installments of her promotional video series. (*See* Niborski Decl., Ex. A.) More specifically, the article states that Rogers "went ballistic" and "cursed like a sailor" after executives

at HSN "pulled the plug on her promotion of an exercise device." (*See id.*) The article also states that Rogers and her "entourage" "trashed" the HSN "green room" in which celebrities wait to go on the air. (*See id.*)

In response to the article, Rogers filed this libel action against HSN, claiming that the article is defamatory because it improperly portrayed her as a "violent, destructive, and irrational person." (Mot. at 1.) Rogers later amended her complaint to include the Enquirer as a defendant as a result of "facts revealed through the course of discovery." (*Id.*)

In the course of litigation, Rogers served the Enquirer with interrogatories requesting the disclosure of all confidential and non-confidential sources relied upon for the information contained in the article. (*See* Niborski Decl., Ex. B.) In response, the Enquirer stated that it did not rely on any non-confidential sources, and that all confidential sources are privileged. (*See id.*) However, the Enquirer did provide a sworn account of how it received information regarding the alleged incident. The account reads in relevant part:

> [T]he Enquirer states that it was initially contacted by Source 1 on or about May 12, 1999, who described the Mimi Rogers incident to the Enquirer ... The Enquirer verified that Source 1 was an employee of Home Shopping Network. The Enquirer requested that Source 1 provide any documents that supported the information he had provided, and Source 1 accordingly sent the Enquirer the two internal Home Shopping Network documents [ ] [one, an e-mail, and the other a security incident report] and the photograph of the trashed green room ... The Enquirer telephoned Source 2, an individual employed at Home Shopping Network, Inc., who the Enquirer learned had knowledge of the Mimi Rogers incident. Source 2 confirmed that the information contained in

the Home Shopping Network documents and the photograph, and the information orally conveyed by Source 1, was accurate.[1]

(Opp. at 9–10.)

In this motion, Rogers seeks to compel the disclosure of the specific identities of the Enquirer's confidential sources, including the names of Source 1 and Source 2. (*See* Mot. at 3.) Rogers asserts that the disclosure of such information is essential to the viability of her claim for libel. The Enquirer maintains that such information need not be disclosed, as it is protected by the common law reporter's privilege. HSN does not oppose Rogers' motion to compel.

## Discussion

### A. *Legal Standard*

#### 1. *California Law Governs the Issue of Privilege*

California law controls whether the identity of the Enquirer's sources are protected by the reporter's privilege. Federal Rule of Evidence 501 states that in a civil action in federal court in which state law provides the rule of decision, "the privilege of a witness ... shall be determined in accordance with State law." Fed.R. Evidence 501; *see also Star Editorial, Inc. v. United States Dist. Court,* 7 F.3d 856, 859 (9th Cir.1993). Moreover, in libel actions, the law of the forum state generally controls. *See Fleury v. Harper & Row,* 698 F.2d 1022 (9th Cir.1983). The present matter was filed in federal court in California based on diversity of citizenship. Thus, state law governs the issue of privilege.

#### 2. *The Five–Part Mitchell Test*

The seminal California case addressing the issue of reporter's privilege is *Mitchell v. Superior Court,* 37 Cal.3d 268, 208 Cal. Rptr. 152, 690 P.2d 625 (1984). In *Mitchell,* the California Supreme Court held that

---

**1.** HSN noted in oral argument that it has not represented to the Court that the sources were HSN employees.

a reporter, editor, or publisher has a qualified common law privilege to withhold information regarding the identity of a confidential source. *See id.* at 279, 208 Cal.Rptr. 152, 690 P.2d 625. The court found that the existence of such a privilege is essential to a free press and that "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." *Id.* at 274–75, 208 Cal.Rptr. 152, 690 P.2d 625 (quoting *Zerilli v. Smith*, 656 F.2d 705, 710–11 (D.C.Cir.1981)).

■ The *Mitchell* court also held that the question of whether information is protected by the reporter's privilege must be decided on a case-by-case basis. *See id.* at 276, 208 Cal.Rptr. 152, 690 P.2d 625. As the court explained, "there is neither an absolute duty to disclose nor an absolute privilege to withhold, but instead a qualified privilege against compelled disclosure which depends on the facts of each particular case." *Id.* To guide future courts, *Mitchell* set forth five "interrelated factors" that courts must weigh in determining the scope of the reporter's privilege in a given case:

(1) "the nature of the litigation and whether the reporter is a party";

(2) "the relevance of the information sought to plaintiff's cause of action" and whether the disclosure that the plaintiff seeks "goes to the 'heart' of [her] suit";

(3) "discovery should be denied unless the plaintiff has exhausted all alternative sources of obtaining the needed information";

(4) "the importance of protecting confidentiality in the case at hand"; and

(5) "the court may require the plaintiff to make a prima facie showing that the alleged defamatory statements are false before requiring disclosure."

*Id.* at 279–83, 208 Cal.Rptr. 152, 690 P.2d 625.

■ Each of these five factors must be analyzed and considered in light of the facts of the case at bar. *See id.* Moreover, although courts must balance the need for public disclosure against the confidentiality interests at stake, the party seeking disclosure clearly has the burden as "such private information is presumptively protected." *Rancho Publications v. Superior Court,* 68 Cal.App.4th 1538, 1549, 81 Cal.Rptr.2d 274 (1999).

**B. Analysis of the Five Mitchell Factors**

■ After reviewing materials submitted by the parties and hearing oral argument, the Court finds that the five *Mitchell* factors do not support disclosure in the present case.

**1. Factor 1: The Nature of the Litigation and Whether the Reporter is a Party**

■ The *Mitchell* court stated that disclosure is especially appropriate in civil cases in which the reporter (or publisher) is joined as a party. As the court explained, "when the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure ..." *Mitchell,* 37 Cal.3d at 279, 208 Cal.Rptr. 152, 690 P.2d 625 (citation omitted).

■ However, as the Enquirer points out, this factor should not be outcome determinative because a plaintiff could simply join a publisher as a defendant in order to tip the balance of the *Mitchell* factors in favor of compelled disclosure. Moreover, the language of *Mitchell* suggests that this factor should be subordinate to the other four. As the court explained, "a libel suit in which discovery is sought from a party defendant[ ] is of the type suitable for requiring disclosure, depending upon the balancing of other relevant considerations." *Id.* at 280, 208 Cal.Rptr. 152, 690 P.2d 625 (footnote omitted). Thus, the fact that the Enquirer is a party simply places this matter in the category of those

cases in which compelled disclosure may be appropriate.[2]

### 2. Factor 2: The Relevance of the Information Sought to the Plaintiff's Cause of Action

The second factor the Court must consider is the importance of the information sought to the plaintiff's cause of action. *See id.* at 280, 208 Cal.Rptr. 152, 690 P.2d 625. Under *Mitchell,* disclosure is not warranted if the information sought is merely relevant to the plaintiff's cause of action. Rather, a court should only compel disclosure if the information sought "goes to the heart of the plaintiff's claim." *Id.*

Rogers argues that this factor supports her motion because disclosure is essential to the viability of her libel claim. Rogers acknowledges that she is a well-known celebrity and will likely be deemed a public figure for the purpose of this litigation. (*See* Mot. at 4.) As a public figure, the First Amendment requires Rogers to demonstrate that the challenged statements were made with "actual malice." (*See id.*) *See also Star Editorial,* 7 F.3d at 861; *Mitchell,* 37 Cal.3d at 279–82, 208 Cal. Rptr. 152, 690 P.2d 625. Rogers argues that compelled disclosure is appropriate because she may need to depose the sources in order to establish actual malice.

As further support for this contention, Rogers cites a number of cases which recognize that disclosure is often appropriate in the context of a libel suit by a public figure against a media defendant, due to the enormous burden of establishing constitutional malice. (*See* Mot. at 4–7.) *See also, e.g., Star Editorial,* 7 F.3d at 860–61 (upholding district court's decision to grant motion to compel Star Editorial to reveal confidential sources in libel suit by public

figure); *Newton v. National Broad. Co.,* 109 F.R.D. 522, 527 (D.Nev.1985) (stating that "Plaintiff has a compelling need for [disclosure of confidential sources] in light of the heavy burden of proof Plaintiff bears as a 'public figure' in this litigation," but denying motion to compel on other grounds).

Applying this second *Mitchell* factor to the case at bar, a cursory analysis suggests that this factor favors compelled disclosure. This conclusion is based in large part on the premise that source identity is always critical in a libel suit by a public figure against a media defendant. However, a more fact-sensitive examination reveals that the identity of the Enquirer's sources may not go "to the heart" of Rogers claim.

■ In the present matter, it is not clear to what extent the Enquirer's sources would assist the plaintiff in establishing actual malice. To prove actual malice, a plaintiff must establish that the defendant "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Newton v. National Broad. Co.,* 930 F.2d 662, 668 (9th Cir.1990) (quoting *Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). Thus, Rogers' ability to establish malice is related to the degree to which the Enquirer can demonstrate that the material elements of the article appear true: the greater the likelihood that the material elements of the article appear true, the less likely it is that the plaintiff will be able to establish actual malice. The Enquirer has produced sufficient evidence to demonstrate, at this preliminary phase, that some incident that may have involved Rogers occurred at

---

**2.** In addition to addressing the issue of whether the journalist is a party defendant, the first *Mitchell* factor also considers the "nature of the litigation." *See id.* at 279, 208 Cal.Rptr. 152, 690 P.2d 625. Thus, Rogers argues that because this is a libel suit brought by a public figure against a media defendant, this first factor favors disclosure. (*See* Mot. at

4–5.) However, this argument seems best suited to the Court's discussion of the second *Mitchell* factor, namely, the relevance of the information sought to the plaintiff's cause of action. Accordingly, the Court considers Rogers' argument regarding the nature of the litigation in the context of the second *Mitchell* factor.

HSN in the late evening of May 9, 1998. Moreover, the Enquirer has testimonial and documentary information, including depositions, an HSN incident report, and an HSN internal e-mail, that supports the truth of many of the facts reported. (*See* Austin Decl., Exs. 6, 12–16; Niborski Decl., Ex. D.) Thus, Rogers has not made a sufficient showing of her ability to establish actual malice to persuade the Court that the sources are essential to her libel claim.

### 3. *Factor 3: The Exhaustion Requirement*

The third factor in the *Mitchell* balancing test may be considered an exhaustion requirement. As the *Mitchell* court stated, "... virtually *all* cases agree that discovery should be denied unless the plaintiff has exhausted all alternative sources of obtaining the needed information.... Compulsory disclosure of sources is the *'last resort.'* " *Mitchell*, 37 Cal.3d at 282, 208 Cal.Rptr. 152, 690 P.2d 625 (emphasis added). This strong language suggests that a district court should deny a motion to compel unless the plaintiff can demonstrate that all alternative methods of obtaining the requested information have truly been exhausted.

 Furthermore, as the Enquirer states, "Courts take this [exhaustion] requirement very seriously, commonly denying motions for confidential source discovery for failure to exhaust." (Opp. at 22.) *See also Mitchell*, 37 Cal.3d at 282, 208 Cal.Rptr. 152, 690 P.2d 625 (finding that plaintiffs had not demonstrated exhaustion of all alternative sources of information). Thus, "Even when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C.Cir.1981).

In the present matter, the parties dispute whether Rogers has satisfied the exhaustion requirement. Rogers has participated in ten depositions, nine of which were noticed by Rogers. (*See* Response at 8.) Six of those deposed were HSN employees at the time of the incident. (*See id.*) HSN acknowledged at oral argument that Rogers appears to have deposed all eyewitnesses to the alleged incident. However, HSN also indicated that Rogers has not deposed all persons present on HSN's premises that evening, or all those who may have knowledge of the alleged incident.

Rogers argues that *Mitchell* does not require her to depose "virtually everyone present at HSN on the day of the events in question before being justified in seeking disclosure of the sources." (Reply at 6.) According to Rogers, *Mitchell* simply demands that she use all "practical" means available to obtain the information from alternate sources, and she maintains that she has done so. (*See id.*) Moreover, Rogers also argues that she has satisfied the exhaustion requirement because she has investigated every potential source of information provided by the defendants. (*See id.*) She deposed those individuals that HSN represented as having first hand knowledge of the events in question and cannot investigate non-confidential sources because the Enquirer claims that it had none. (*See id.*) Rogers argues that these efforts satisfy the *Mitchell* exhaustion requirement as applied by the district court and the Ninth Circuit in *Star Editorial.*

However, the Enquirer notes that there were numerous other individuals present on HSN's premises during the alleged incident who have not yet been deposed. (*See* Opp. at 22 & n. 5.) Thus, although the Court credits Rogers with having deposed many key individuals, the Court is not convinced that Rogers has deposed all those reasonably likely to have knowledge of the alleged incident.

Furthermore, contrary to Rogers' assertion, *Star Editorial* does not clearly support plaintiff's position in this case. The trial court in *Star Editorial* expressed great concern as to whether the plaintiff had truly exhausted all "other means to

discover the identity of [the] confidential source ... or other sources of evidence to prove actual malice." *Dangerfield v. Star Editorial, Inc.*, 817 F.Supp. 833, 838 (C.D.Cal.1993). The court also noted that it was "troubling" that the plaintiff failed to "exploit [ ] an obvious source for evidence," when the plaintiff neglected to depose the reporter who interviewed the informant. *Id.* However, the trial court ultimately granted the plaintiff's motion to compel, in part because "the [p]laintiff made extensive efforts to identify the unnamed source through other means," and the plaintiff "pursued other leads that resulted from [deposition] testimony also to no avail." *Id.*

Unlike the plaintiff in *Star Editorial*, Rogers has not pursued all other leads that resulted from deposition testimony, and the Court is not persuaded that she has essentially exhausted her ability to discover the identity of the sources by other means.

4. *Factor 4: The Importance of Protecting Confidentiality in the Case at Hand*

 The fourth *Mitchell* factor requires the Court to consider the broader context of the case at bar. If the information reported relates to a matter of "great public importance" where "the risk of harm to the source is a substantial one," the Court may refuse disclosure requests even if the plaintiff has no other means of obtaining the information. *Mitchell*, 37 Cal.3d at 282–83, 208 Cal.Rptr. 152, 690 P.2d 625.

It is difficult to assess the importance of this factor because *Mitchell* did not define the phrase "great public importance." *See id.* The only guidance provided by the court is the following statement, which concluded the court's explanation of the fourth *Mitchell* factor: "The investigation and revelation of hidden criminal or unethical conduct is one of the most important roles of the press in a free society—a role that may depend upon the ability of the press and the courts to protect sources who may justifiably fear exposure and pos-

sible retaliation." *Id.* at 283, 208 Cal.Rptr. 152, 690 P.2d 625. This statement suggests that if the article at issue involves reports of "hidden criminal or unethical conduct," courts should be reluctant to compel disclosure.

Recent California case law both confirms and enhances this interpretation of the fourth *Mitchell* factor. In *Anti–Defamation League of B'nai B'rith v. Superior Court*, 67 Cal.App.4th 1072, 1096, 79 Cal. Rptr.2d 597 (1998), the Court of Appeal applied the fourth factor by conducting a two-prong inquiry. First, the court captured the *Mitchell* court's concern regarding issues of great public importance by asking whether the information sought reveals improper criminal or ethical conduct on the part of powerful interests. *See Anti–Defamation League of B'nai B'rith*, 67 Cal.App.4th at 1096, 79 Cal.Rptr.2d 597. Second, the court incorporated the *Mitchell* court's discussion of the potential risk to a source by asking whether the sources would be exposed to great risk or harmful retaliation if their identities were revealed. *See Anti–Defamation League of B'nai B'rith*, 67 Cal.App.4th at 1096, 79 Cal. Rptr.2d 597.

Applying this two-prong inquiry to the present matter, it appears as if the fourth *Mitchell* factor does not strongly favor either side. None of the parties argue that this case involves revelations of improper criminal or ethical conduct. (*See* Opp. at 23 & Reply at 8.) However, the Enquirer does suggest that in the present instance, the risk to the sources may be great, as Rogers has made clear her intention to sue those responsible for the article. (*See* Opp. at 23–24.) Therefore, the Court concludes that this fourth factor does not appear to favor either party.

5. *Factor 5: Prima Facie Showing of Falsity*

Finally, *Mitchell* held that the Court "may" require "a prima facie showing that the alleged defamatory statements are false before requiring disclosure." *Mitch-*

*ell,* 37 Cal.3d at 283, 208 Cal.Rptr. 152, 690 P.2d 625. The *Mitchell* court suggested that a showing of falsity is only required when a case involves a matter of great public importance. *See id.* As the court explained, "This [fifth] requirement is closely related to the previous one. There is a great public interest in the truthful revelation of wrongdoing, and in protecting the 'whistleblower' from retaliation; there is very little public interest in protecting the source of false accusations of wrongdoing." *Id.*

Although *Mitchell* suggests that the significance of this fifth factor is linked to the fourth factor, a recent California case states otherwise. In *Anti–Defamation League of B'nai B'rith,* the California Court of Appeal found that the *Mitchell* court's use of the word "may" indicates that "it viewed the prima facie showing as a discretionary requirement." *Anti–Defamation League of B'nai B'rith,* 67 Cal. App.4th at 1096, 79 Cal.Rptr.2d 597. Perhaps more importantly, the Court of Appeal applied and discussed the prima facie showing requirement separate and apart from the fourth *Mitchell* factor. *See id.* at 1097, 79 Cal.Rptr.2d 597.

In the present matter, the parties dispute whether the discretionary prima facie showing requirement is applicable. Rogers argues that the Court need not require a prima facie showing of falsity, but that if such a showing is required, there is ample evidence to demonstrate that the article contains misleading and exaggerated statements. (*See* Reply at 9–11.) The Enquirer maintains that a showing of falsity is required and that the record demonstrates that the essence of the article is, in fact, accurate. (*See* Opp. at 17–19.)

 Because " 'routinely grant[ing] motions seeking compulsory disclosure.... without first inquiring into the substance of a libel allegation would utterly emasculate the fundamental principles [of New York Times and similar cases],' " the Court holds that Rogers must satisfy this fifth *Mitchell* factor. *Mitchell,* 37 Cal.3d at 283, 208 Cal.Rptr. 152, 690 P.2d 625 (quot-

ing *Cervantes v. Time, Inc.* 464 F.2d 986, 993 (8th Cir.1972)). Thus, Rogers must make a prima facie showing of falsity to prove that her claim is not without merit.

With respect to the issue of falsity, Rogers can demonstrate that portions of the article are technically incorrect. In fact, the Enquirer admits that the article is "inaccurate" in at least four respects:

(1) the article misreported the date of the alleged incident;

(2) the article referred to Rogers' "entourage," but "the testimony is that the guests that she [Rogers] and Mr. Lewis had at HSN that day had left the facilities" prior to the alleged incident;

(3) the article did not include Rogers' alleged profanity when quoting a statement Rogers' is alleged to have made; and

(4) the article reported that "food items that HSN had supplied to Ms. Rogers had been thrown around the make-up area," but the Enquirer concedes that "the testimony is undisputed that make-up products and other glass containers" were the only objects allegedly "thrown" around the make-up area.

(*See* Opp. at 19 n. 4.)

In addition, the article is accompanied by a photograph of Rogers with a caption that is inaccurate. (*See* Mot. at 9.) The photograph depicts Rogers with her arms raised and the caption reads, "Mimi Rogers exploded over shopping show cancellation." (*See* Niborski Decl., Ex. A.) The Enquirer concedes that this is not a photograph of Rogers at the time of the alleged incident. Rather, it "depicts Rogers performing an exercise during the production of a maternity exercise video while seven months pregnant." (Mot. at 9.)

Although the article appears to contain the above-mentioned inaccuracies, the presence of these inaccuracies does not necessarily amount to a prima facie showing of falsity. There is an element of

materiality inherent in the *Mitchell* court's discussion of what constitutes a prima facie showing of falsity.[3] *See Mitchell*, 37 Cal.3d at 283, 208 Cal.Rptr. 152, 690 P.2d 625. Thus, in order to make a prima facie showing of falsity, Rogers must do more than point to inaccuracies in the article. Rogers must make a prima facie showing of material falsity—falsity that is sufficiently substantive so as to suggest that she has a viable claim for libel.

The inaccuracies noted above do not constitute a prima facie showing of material falsity. Additionally, the Enquirer appears to have relied on the HSN incident report for at least two of inaccuracies noted above.[4] Thus, evaluating the issue of falsity in light of the totality of the circumstances of this case, the Court cannot say that Rogers has made a sufficient showing of falsity to support disclosure.

### Conclusion

Therefore, for the reasons set forth above, the Court denies the plaintiff's motion to compel without prejudice.

**IT IS SO ORDERED.**

---

**3.** For example, it would hardly amount to a prima facie showing of falsity if the article stated that the room where the alleged incident occurred was green while in fact the room was blue.

**4.** The incident report specifically refers both to Rogers' "entourage" and to "snack trays" of food. (*See* Niborski Decl., Ex. D.)